**ROLLINS ENVIRONMENTAL SERVICES (NJ) INC., Petitioner,**

v.

**U.S. ENVIRONMENTAL PROTECTION AGENCY, Respondent.**

**No. 90–1508.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 14, 1991.

Decided July 5, 1991.

Louis A. Minella, with whom Michael W. Steinberg was on the brief, Washington, D.C., for petitioner.

Mary Ellen M. Levine, Atty., E.P.A., with whom, James C. Nelson, Acting Associate Gen. Counsel, Patricia A. Roberts, Acting Asst. Gen. Counsel, E.P.A., Michael A. McCord and Kaye Allison, Attys., Dept. of Justice, were on the brief, Washington, D.C., for respondent.

Ashley Doherty, Atty., Dept. of Justice, Washington, D.C., also entered an appearance for respondent.

Before EDWARDS, BUCKLEY and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

Opinion dissenting in part and concurring in part filed by Circuit Judge HARRY T. EDWARDS.

RANDOLPH, Circuit Judge:

Rollins Environmental Services (NJ) Inc. owned and operated a hazardous waste facility in Logan Township, New Jersey. In August 1982, Rollins began closing the facility's Basin 210, a concrete basin with a hypalon liner containing some 35,000 pounds of liquids and sludges with a PCB concentration of 1874.8 parts per million (ppm). Rollins removed the liquids and sludges, shipped them to Texas, and incinerated them at a Rollins facility approved for PCB disposal under the Toxic Substances Control Act (TSCA), 15 U.S.C. § 2601 *et seq. See* 40 C.F.R. § 761.70. Rollins also removed the hypalon liner and sent it to a secure land-fill in compliance with the applicable TSCA regulation, 40 C.F.R. § 761.75.

Rollins then triple-rinsed the basin with a solvent, as required by the following Environmental Protection Agency decontamination regulation, the meaning of which gives rise to the present controversy:

Any PCB container to be decontaminated shall be decontaminated by flushing the internal surfaces of the container three times with a solvent containing less than 50 ppm PCB. The solubility of PCBs in the solvent must be five percent or more by weight. Each rinse shall use a volume of the normal diluent equal to approximately ten (10) percent of the PCB container capacity. *The solvent may be reused for decontamination until it contains 50 ppm PCB. The sol-*

*vent shall then be disposed of as a PCB in accordance with § 761.60(a).*

40 C.F.R. § 761.79(a) (italics added).

After each rinse, including the final rinse, the company's analysis indicated that the solvent contained PCB concentrations of less than 50 ppm. When finished, the company incinerated the solvent, along with some rainwater that had accumulated during the operation, at an on-site facility meeting the requirements of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6928 *et seq.*, but not those contained in EPA's TSCA regulations, 40 C.F.R. § 761.70. Rollins followed this course because it believed, in light of the italicized portion of section 761.79(a), that *only* solvents having a PCB concentration of 50 ppm or more had to be disposed of as PCBs. (Wastes with PCB concentrations under 50 ppm are not regulated by TSCA. *See* 40 C.F.R. § 761.60(a).)

Six years later, EPA issued an administrative complaint charging Rollins with violating TSCA by incinerating liquid PCBs in an incinerator not approved for that purpose. The complaint cited 40 C.F.R. § 761.1(b), a TSCA "anti-dilution" regulation specifying that a particular PCB concentration cannot "be avoided as a result of dilution." Because the dregs in the basin contained PCBs at a concentration of 1874.8 ppm, the complaint attributed the equivalent PCB concentration to the 22,700 gallons of solvent used to rinse the basin. The complaint proposed a civil penalty of $25,000, the maximum amount under the statute.

Rollins requested a hearing. The ALJ, in an interlocutory order, agreed with EPA that Rollins had violated the PCB disposal regulations. When the parties were unable to come to an agreement regarding the amount of the penalty, a hearing was held before a second ALJ who, finding unusually compelling mitigating circumstances, assessed a civil penalty of zero. The ALJ stressed that the decontamination regulation was unclear, which EPA itself recognized, and that Rollins' "reading of the Regulations had a definite plausibility." He further noted that Rollins had "proceed-

ed with care, by burning the rinse in an incinerator approved under RCRA," and that no unacceptable pollution had occurred.

On the last possible day, EPA filed an administrative appeal of the zero penalty assessment. In a lengthy opinion, the Chief Judicial Officer (CJO) held that the decontamination regulation was "clear," and that Rollins' reading was at best superficial. The CJO thought it "inaccurate to describe Rollins' interpretation of the rules as having 'a definite plausibility,' " and finding no other mitigating circumstances, assessed a penalty of $25,000, as EPA had originally proposed.

■ Rollins seeks review not only of the $25,000 penalty, but also of the finding that it violated the regulation.[1] It is true, as EPA argues, that Rollins failed to file an administrative appeal to the CJO from the ALJ's finding of a violation. But this is of no moment. The finding depended entirely on the validity of EPA's interpretation of its regulation. The CJO reviewed the interpretation and sustained it in the process of finding no ambiguity in the regulation warranting mitigation of the proposed $25,000 penalty. No useful purpose would therefore be served by invoking the exhaustion doctrine against Rollins. The issue was fully considered and decided. *Natural Resources Defense Council v. EPA*, 824 F.2d 1146, 1151 (D.C.Cir.1987) (en banc).

The decontamination regulation on which the finding of violation rests is confusing. The problem stems from the word "then" near the end of section 761.79(a): companies may reuse a solvent "until it contains 50 ppm PCB" and the solvent "shall then be disposed of as a PCB...." If "then" refers to the point at which the solvent reaches a concentration of 50 or more ppm PCB, a company would not be required to dispose of the solvent as a PCB if it never reaches that level. That at least is the way Rollins read the regulation. The other interpretation, endorsed by EPA, is rather more strained. EPA reads "then" to refer to the time when the rinsing is over and the solvent is no longer being reused. "Then," regardless of the level of PCB concentration, the solvent must be treated as a PCB. EPA explains that it considers all solvents to be diluents and, as such, to have the same PCB concentration as the waste they dilute. EPA's anti-dilution regulation (40 C.F.R. § 761.1(b)), which applies not just to decontamination through rinsings but generally, so indicates. As EPA now sees it, section 761.79(a) therefore means that for the purpose of reusing solvents, PCB concentration should be measured on the basis of what the solvent *actually* contains, while for purposes of disposal, the solvent shall be *assumed* to contain a concentration of PCB equal to the PCB level of the container before it was flushed.

■ EPA's interpretation would not exactly leap out at even the most astute reader, particularly since the decontamination regulation does not refer to the anti-dilution provision. Still, we must sustain it. It is logically consistent with the language of the regulation and it serves a permissible regulatory function. The same of course can be said about Rollins' interpretation. But in a competition between possible meanings of a regulation, the agency's choice receives substantial deference. *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 566, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980); *Western Union Telegraph Co. v. FCC*, 815 F.2d 1495, 1503 (D.C.Cir.1987). Rollins' only argument against the finding of violation was that EPA misconstrued its regulation.[2] Since we reject that argu-

**1.** Rollins also argues that the complaint was barred by the statute of limitations. Although the first ALJ considered the question, and rejected the argument, Rollins did not file an administrative appeal of that ruling and the CJO did not consider it. The statute of limitations issue is therefore not before us. *See D.C. Transit System, Inc. v. Washington Metropolitan Area Transit Comm'n*, 466 F.2d 394, 413–16 (D.C.

Cir.), *cert. denied,* 409 U.S. 1086, 93 S.Ct. 688, 34 L.Ed.2d 673 (1972).

**2.** Under the due process clause of the Fifth Amendment, a regulation carrying penal sanctions must give "fair warning of the conduct it prohibits or requires." *Gates & Fox Co. v. OSHRC,* 790 F.2d 154, 156 (D.C.Cir.1986). In this court, however, Rollins did not invoke due process as a ground for avoiding liability. Rol-

ment, we turn to the remaining issue concerning the penalty.

The second ALJ determined that the appropriate penalty should be zero, primarily on the ground that Rollins had reasonably relied on an interpretation of the regulation that not only had a "definite plausibility," but also had substantial support within EPA itself. The ALJ pointed out that as late as November 1989—more than a year after EPA brought the complaint against Rollins—considerable disagreement remained within the agency about the meaning of section 761.79(a). After the first ALJ issued the initial interlocutory order in this case, EPA prepared an internal document pursuant to the agency's Expedited PCB–Rule Interpretation Process (EPIP), titled "Determination Regarding Disposal of PCB Container Rinsate (Less Than 50 PPM)—Final Issue Resolution Decision." In that report, EPA acknowledged that "[t]here has been significant disagreement among various headquarters and regional offices as to whether such rinsate is regulated for disposal." [3] The report specifically mentioned the first ALJ's holding in this case, but added: "However, various EPA offices have been giving conflicting guidance regarding this issue. The Office of General Counsel has stated that either interpretation can be supported by the regulatory language." After analyzing the two options, the report concluded that solvent

contaminated with less than 50 ppm PCBs nevertheless must be disposed of as a PCB.

In the face of this report and the ambiguous language of the regulation, the CJO's decision that the regulation was "clear" and that Rollins should therefore pay a $25,000 penalty cannot be sustained. When the agency itself is uncertain of the meaning of its regulation, when agency personnel give conflicting advice to private parties about how to comply with it, and when the agency's chief legal officer finds the regulatory language equally supportive of one of two possible constructions, it is arbitrary to find the regulation "clear." Ambiguity may be in the eye of the beholder. But here EPA's misleading imprecision, not Rollins' lack of acuity, led the company astray. No reasonable reader of this provision could have known that EPA's current construction is what the agency originally must have had in mind.

EPA understandably does not defend the CJO's decision on the ground that the regulation was unambiguous. It relies on a 1982 letter from a "Deputy Associate Enforcement Counsel" to a private attorney as evidence that, even then, the agency required solvents used to rinse PCB containers to be disposed of as PCBs. But this letter was never sent to Rollins or its attorneys and it was never made public. At oral argument, counsel for EPA suggested that the letter was important be-

---

lins' opening brief argued instead that it committed no violation because its actions were consistent with the decontamination regulation and because its reading of the regulation was correct. Brief for Petitioner at 10, 11. Rollins' argument about lack of notice stemming from the regulation's ambiguity was made only in support of a zero penalty assessment. Its reply brief did ask "How can the regulated community be considered to be 'on notice as to the obligations' ... if the EPA is uncertain as to what the obligations are?" Reply Brief at 8. But this single sentence was not explicitly aimed at liability rather than the penalty, it was not supported by any authorities, and it came too late. Issues may not be raised for the first time in a reply brief. See McBride v. Merrell Dow and Pharmaceuticals, Inc., 800 F.2d 1208, 1210–11 (D.C.Cir.1986); Asociacion de Compositores v. Copyright Royalty Tribunal, 809 F.2d 926, 928 (D.C.Cir.1987). At no point did either of Rollins' briefs mention the due process clause or

Gates & Fox or any other comparable decision such as Diamond Roofing Co. v. OSHRC, 528 F.2d 645 (5th Cir.1976). If Rollins had meant to claim lack of fair warning as a ground for setting aside the finding of violation, it was obligated to say precisely that in its opening brief and to include an argument, with citations to authorities in its favor. Our oft-cited decision in Carducci v. Regan, 714 F.2d 171, 177 (D.C.Cir.1983), so holds, and Rule 28(a)(4), Fed. R.App.P., generally precludes consideration of issues not addressed in the parties' briefs. See Consumers Union v. FPC, 510 F.2d 656, 662 n. 9 (D.C.Cir.1974) (per curiam). While there are exceptions, none is warranted here.

3. The report was prepared for internal use only. A one page summary was made publicly available. The CJO noted that "[t]his one-page version reiterates that 'various EPA offices have been giving conflicting guidance regarding this issue.'"

cause it showed that, had Rollins contacted the agency in 1982, it *might* have been given EPA's current interpretation of section 761.79(a). But counsel also admitted that, depending on which official responded to the inquiry, EPA *might* have given Rollins the opposite advice. The imposition of a serious penalty cannot rest on such fortuity.

Section 16 of TSCA required the agency to consider mitigating factors in assessing a civil penalty. "In determining the amount of a civil penalty, the Administrator *shall* take into account the nature, circumstances, extent, and gravity of the violation ... and with respect to the violator ... the degree of culpability, and such other matters as justice may require." 15 U.S.C. § 2615(a)(2)(B) (emphasis added). In light of the ambiguity of the regulation, the nature of the actions taken by Rollins, and the absence of deleterious consequences, we agree with the second ALJ that imposing a monetary penalty on Rollins would be without justification. *Butz v. Glover Livestock Comm'n*, 411 U.S. 182, 185–86, 93 S.Ct. 1455, 1457–58, 36 L.Ed.2d 142 (1973). "Traditional concepts of due process incorporated into administrative law preclude an agency from penalizing a private party for violating a rule without first providing adequate notice of the substance of the rule." *Satellite Broadcasting Co. v. FCC*, 824 F.2d 1, 3 (D.C.Cir. 1987). *Cf. Martin v. OSHRC*, —— U.S. ——, 111 S.Ct. 1171, 1180, 113 L.Ed.2d 117 (1991). While we defer to EPA's interpretation of the rule, the lack of adequate notice resulting from the regulation's inherent uncertainty in meaning is a mitigating factor that had to be taken into account in assessing the civil penalty. 15 U.S.C. § 2615(a)(2)(B). We therefore set aside the CJO's penalty determination as being contrary to law, 5 U.S.C. § 706(2), and rein-

state the zero penalty assessment the CJO rejected.

The petition for review is granted in part and denied in part.

EDWARDS, Circuit Judge, dissenting in part and concurring in part:

As is clear from the majority opinion, no *reasonable* reader of the disputed regulations could have known that EPA's current construction of the regulations is what the agency originally had in mind. This being the case, there is no way that Rollins can be held to have violated the cited regulations.

It is true that "[c]ourts must give deference to an agency's interpretation of its own regulations." *Gates & Fox Co. v. OSHRC*, 790 F.2d 154, 156 (D.C.Cir.1986) (Scalia, J.) "Where the imposition of penal sanctions is at issue, however, the due process clause prevents that deference from validating the application of a regulation that fails to give fair warning of the conduct it prohibits or requires." *Id.* Thus, "[i]f a violation of a regulation subjects private parties to criminal or civil sanctions, a regulation cannot be construed to mean what an agency intended but did not adequately express." *Diamond Roofing Co. v. OSHRC*, 528 F.2d 645, 649 (5th Cir. 1976) (cited with approval in *Gates*, 790 F.2d at 156).[1] If Rollins could not reasonably have known what the agency had in mind, it cannot now be held to have violated the regulation.

As Judge Scalia suggested in *Gates*, it does not matter "whether, in a non-penal context, the [agency's] ... interpretation of [the disputed regulation] ... might be permissible." 790 F.2d at 156. If a regulation does not give "fair warning" of the conduct it prohibits or requires, no violation can be found.[2]

---

**1.** It is basic hornbook law in the administrative context that "the application of a regulation in a particular situation may be challenged on the ground that it does not give fair warning that the allegedly violative conduct was prohibited." *Phelps Dodge Corp. v. Federal Mine Safety and Health Review Comm'n*, 681 F.2d 1189, 1192 (9th Cir.1982).

**2.** Although Rollins will avoid a monetary penalty in this case, the violation found is still a significant penalty. Not only has Rollins unfairly been labelled a "law breaker," but this violation can be used against the company in assessing penalties with respect to any future violations. *See* 15 U.S.C. § 2615(a)(2)(B) (1988) (requiring EPA, in selecting amount of civil penalty for violation of TSCA, to consider viola-

The majority seems to suggest that the question in this case is whether inadequate notice vitiated the violation. This is not the issue. The question is whether Rollins had "fair warning" sufficient to justify a finding of a violation. There can be no violation to vitiate if Rollins could not reasonably have known what the agency had in mind. Notice is not merely a mitigating circumstance; it is an element of proof of violation. That is exactly the point of Judge Scalia's opinion in *Gates* (and every other case that has considered the question).

Furthermore, I cannot fathom the argument in the majority opinion suggesting that we cannot consider the "notice" issue because Rollins never raised a defense of inadequate notice. The majority appears to find that Rollins cannot prevail on the liability issue because the "due process clause" was never mentioned as such in any of the pleadings in this case. This makes no sense to me. The whole point of petitioner's argument in this case has been that a party cannot be found to have violated a regulatory provision absent "fair warning" that the allegedly violative conduct was prohibited. This is a cardinal rule of administrative law, *see Phelps Dodge Corp., supra* note 1, the breach of which is so egregious that the courts have gone so far as to hold that a lack of notice may offend the due process clause, *see Gates*, 790 F.2d at 156. But it is not necessary for us to "reach out" to decide a constitutional issue in order to resolve the merits of the notice issue in this case. It is a simple principle of administrative law that, in adopting administrative regulations, an agency "has the responsibility to state with ascertainable certainty what is meant by the standards ... promulgated." *See Diamond Roofing*, 528 F.2d at 649 (violation overturned because agency's regulation did not give regulated parties "fair warning" of prohibited conduct; no mention was made of the "due process clause"). Throughout the proceedings in this case, both before the agency and this court, Rol-

lins has claimed that no violation should be found because the company could not reasonably have known what the agency had in mind with its regulations. So it cannot be claimed that the issue is not before us.

The opinion of the Chief Judicial Officer ("CJO") makes it absolutely clear that the "fair warning" argument was raised and decided at the agency level. Indeed, the CJO devoted ten pages in his opinion to "regulatory clarity," because, as he stated, *"[a]s a general proposition, the Agency recognizes the importance of regulatory clarity and its obligation to draft rules in a manner that puts the regulated community on notice as to the obligations thereunder."* *Rollins Environmental Services (NJ) Inc.*, Docket No. II–TSCA–PCB–88–0116, at 13 (EPA Sept. 28, 1990) (emphasis added), *reprinted in* Joint Appendix ("J.A.") 34, 46. The CJO observed that, pursuant to this principle, "[t]he Agency has repeatedly ruled against enforcement staff where the applicable rules did not support the complainant's case or were fatally ambiguous." *Id.* at 13 n. 14, *reprinted in* J.A. 46 n. 14. The CJO went on to note that "[t]he question here is whether the applicable rules are sufficiently clear to support an enforcement action, to put the regulated community on notice as to its obligations, *and* to avoid penalty mitigation." *Id.* at 18 n. 20 (emphasis added), *reprinted in* J.A. 51 n. 20. And, in his ruling against Rollins, the CJO found that the "complexity" of the regulations did not "excuse ignorance of the law *or* justify penalty mitigation." *Id.* at 18–19 (emphasis added), *reprinted in* J.A. 51–52. In other words, the CJO considered the lack of notice question in connection with both the violation and penalty issues.

Thus, it is utterly specious to suggest that "inadequate notice" was not an issue in the agency's enforcement action before the CJO. And it borders on the frivolous to claim that the CJO failed to address the issue because he never mentioned the "due process clause." As noted above, and as is

tor's "history of prior such violations"); *Notice of Availability of Polychlorinated Biphenyls Penalty Policy,* 55 Fed.Reg. 13,955 (1990) (indicating

that prior finding of violation justifies upward adjustment of penalty amount).

obvious from the ten pages of the CJO's opinion that are devoted to the issue, one need never reach the constitutional question in deciding whether a regulated party has received notice sufficient to justify an enforcement action.

The only remaining question is whether Rollins preserved the issue of inadequate notice in petitioning for review of the CJO's opinion before this court. The answer to this question is clear because Rollins raised the notice issue in both its original and reply briefs. In the opening sections of its initial brief, Rollins' principal claim is that it could not have violated the disputed regulations because the company's actions were consistent with the only *reasonable* interpretation of those regulations. *See, e.g.,* Brief for Petitioner at 10 ("Thus, Rollins' actions in *not* disposing of the PCB rinsate as a PCB were consistent with the regulation since it is undisputed that the rinsate contained less than 50 ppm PCB. Any contrary reading of the regulation inescapably leads to a question as to how this language could be chosen if any other meaning was intended.") (emphasis in original). In response, EPA expressly addresses petitioner's argument that the disputed regulations could "not [be read to] apply to Rollins' activity here," quoting the CJO's conclusion that the relevant regulations *"make clear* that rinsate with less than 50 ppm PCB must be disposed of in a TSCA-approved ... incinerator." Final Brief of Respondent Environmental Protection Agency at 41, 43 (emphasis added); *see also id.* at 41–43.

Rollins' argument on inadequate notice is expounded further in its reply brief. The petitioner first quotes the CJO's ruling that, "[a]s a general proposition, the Agency recognizes the importance of regulatory clarity and its obligation to draft rules in a manner that puts the regulated community on notice as to the obligations thereunder," then challenges the CJO's finding that the ambiguity in the regulation was not sufficient to vitiate an enforcement action. Reply Brief for Petitioner at 8. The petitioner also asks how the "regulated community [can] be considered to be 'on notice as to ... [its] obligations' ... if the EPA is uncertain as to what the obligations are?"

*Id.* The petitioner concludes by contending that, "[i]n view of [the foregoing arguments on liability], ... Rollins did not violate ... any ... applicable rule or regulation, and therefore is not liable for its handling of less than 50 ppm rinsate." *Id.* at 10. Following these arguments on *liability*, Rollins then advances an alternative argument, contending that, even if a violation is found, no penalty should be assessed due to mitigating circumstances. *Id.* at 10–11.

The majority opinion contends that petitioner's argument on inadequate notice cannot be considered because it was not raised until petitioner's submission of its reply brief. As a factual matter, this contention is simply wrong: the "notice issue" was dealt with at length in the CJO's opinion; it was raised in petitioner's opening brief; it drew a response in respondent's brief; and it was expounded on in petitioner's reply brief. Furthermore, the majority's reasoning is bizarre, for, in upholding Rollins' claim for mitigation, the majority reaches the very issue it would now avoid, finding that "[n]o reasonable reader of [the disputed regulations] ... could have known that EPA's current construction is what the agency originally must have had in mind." In other words, the majority's mitigation analysis relies on the same lack of notice that *a priori* forecloses a finding of a violation as a threshold matter.

Even if we assume that Rollins did not raise the notice issue until its reply brief, this would not be dispositive of the question before us. It is true that, as a general matter, the court will not consider a legal argument first advanced in a reply brief. *See, e.g., McBride v. Merrell Dow and Pharmaceuticals, Inc.,* 800 F.2d 1208, 1210 (D.C.Cir.1986). However, it is also the law of the circuit that, "notwithstanding the requirements of Federal Rule of Appellate Procedure 28, regarding the contents of briefs on appeal, we may ... consider points not raised in the briefs or in oral argument. Our willingness to do so rests on a balancing of considerations of judicial orderliness and efficiency against the need for the greatest possible accuracy in judicial decisionmaking." *Consumers Union of United States, Inc. v. Federal Power*

*Comm'n,* 510 F.2d 656, 662 (D.C.Cir.1974) (footnote omitted); *see also Columbia Gas Transmission Corp. v. F.E.R.C.,* 844 F.2d 879, 880 (D.C.Cir.1988) (per curiam). This court surely has the authority to consider the question at hand so as to avoid the "unduly harsh" result reached by the majority opinion. *Consumers Union,* 510 F.2d at 662 n. 10.

It strikes me as both absurd and injudicious to ignore the undeniable legal and logical implications of Rollins' notice argument simply because petitioner failed to mention the "due process clause." The due process clause is not in issue, nor is it critical to a resolution of the notice issue that is before the court. To reach the result that it has today, the majority has strained to embrace a notion a legal formalism that defies every notion of justice. The problem is that the "formalism" sought to be embraced is not even well-founded, so that the majority opinion produces nothing more than an unduly harsh result.

Because I would reverse the finding of violation, I concur in the majority's holding that the penalty imposed against Rollins was contrary to law.