# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 5, 2023       Decided August 23, 2024

No. 22-1029

UNITED PARCEL SERVICE, INC.,
PETITIONER

v.

POSTAL REGULATORY COMMISSION,
RESPONDENT

AMAZON.COM SERVICES, LLC, ET AL.,
INTERVENORS

———

On Petition for Review of Orders
of the Postal Regulatory Commission

———

*Kathleen M. Sullivan* argued the cause for petitioner. On the briefs were *David M. Cooper* and *Steig D. Olson*.

*Michael Shih*, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Michael S. Raab* and *Kevin J. Kennedy*, Attorneys, *David A. Trissell*, General Counsel, Postal Regulatory Commission, *Lauren A. D'Agostino*, Deputy General Counsel, and *Reese T. Boone*, Attorney.

*Eric P. Koetting*, *Morgan E. Rehrig*, and *Michael D. Weaver*, Attorneys, U.S. Postal Service, *Michael F. Scanlon* and *John Longstreth* were on the brief for respondent-intervenors.

Before: SRINIVASAN, *Chief Judge*, GARCIA, *Circuit Judge*, and ROGERS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GARCIA.

GARCIA, *Circuit Judge*: The Postal Regulatory Commission is an independent agency that oversees the United States Postal Service. The Postal Service sells two kinds of products: "market dominant" products such as First-Class mail, where the Postal Service exercises monopoly power with congressional blessing, and "competitive" products such as package delivery, where the Postal Service competes with private companies. Congress tasked the Commission with ensuring that the Postal Service competes fairly in the competitive products market. The Commission must ensure, for example, that the Postal Service does not unfairly subsidize its competitive products business with earnings from its market-dominant products to the disadvantage of private competitors.

Petitioner United Parcel Service, Inc. ("UPS") is one such competitor. Dissatisfied with how the Postal Service prices competitive products, UPS petitioned the Commission to initiate rulemaking proceedings. UPS argued that the Postal Service underprices its competitive products by not holding those products responsible for "peak-season" costs caused by a spike in consumer demand for package deliveries every December.

The Commission denied UPS's petition and its motion for reconsideration. For the reasons explained below, we deny UPS's petition for review of those orders.

**I**

**A**

The Commission exercises regulatory authority under the Postal Accountability and Enhancement Act ("Accountability Act"), Pub. L. No. 109-435, 120 Stat. 3198 (2006). As we have explained, the Accountability Act

> ensure[s] (among other things) that the Postal Service offers its competitive products on fair terms. To that end, the Accountability Act requires the Commission to promulgate regulations that ensure that the Postal Service is not using revenues from market-dominant products subject to its monopoly power to defray costs competitive products would otherwise have to be priced to cover.

*United Parcel Serv., Inc. v. Postal Regul. Comm'n* ("*UPS II*"), 955 F.3d 1038, 1042 (D.C. Cir. 2020) (cleaned up).

Specifically, the Commission must promulgate regulations to achieve three objectives. First, it must "prohibit the subsidization of competitive products by market-dominant products." 39 U.S.C. § 3633(a)(1). Second, it must "ensure that each competitive product covers its costs attributable," *id.* § 3633(a)(2), defined as "the direct and indirect postal costs attributable to such product through reliably identified causal relationships," *id.* § 3631(b). Third, the Commission must "ensure that all competitive products collectively cover what the Commission determines to be an appropriate share of the institutional costs of the Postal Service." *Id.* § 3633(a)(3).

The Postal Service implements the first two mandates using an "incremental-cost" approach that we broadly sanctioned in *United Parcel Service, Inc. v. Postal Regulatory Commission* ("*UPS I*"), 890 F.3d 1053 (D.C. Cir. 2018). The incremental costs of competitive products are the costs "that would disappear were the Postal Service to stop offering those products for sale." *Id.* at 1055. Under Section 3633(a)(1), the Postal Service identifies the incremental cost of competitive products as a whole. *See id.* at 1059. For Section 3633(a)(2), the Postal Service examines the incremental cost of each specific competitive product. *See id.* at 1066–69.

As for the third mandate, the Act does not define the term "institutional costs," but we have upheld the Commission's interpretation of that term to refer to residual costs that cannot be attributed to any specific product via reliably identified causal relationships. *See id.* at 1055–56. The Postal Service thus treats as "institutional costs" all costs that are not "costs attributable." *See id.* It then requires competitive products to cover "an appropriate share" of those institutional costs. *See United Parcel Serv., Inc. v. Postal Regul. Comm'n* ("*UPS III*"), 96 F.4th 422, 424 (D.C. Cir. 2024). In sum, the Act effectively "subjects each competitive product to a price floor, which must be set high enough to cover both that product's 'costs attributable'" and an appropriate share of the Postal Service's "institutional costs" under Section 3633(a)(3). *UPS I*, 890 F.3d at 1055 (cleaned up).

In 2020, we remanded a Commission order adopting a formula for the appropriate share of institutional costs under Section 3633(a)(3), with instructions to better explain its reasoning in certain respects. *See UPS II*, 955 F.3d at 1051–52. On remand, the Commission revised its analysis while readopting the same formula. UPS challenged that order in a petition for review that was heard—and decided—by this panel in a companion case to this one. *See UPS III*, 96 F.4th 422.

We concluded that the Commission adequately addressed the issues identified in *UPS II* and reasonably exercised its statutory discretion in adopting the appropriate share formula. *Id.* at 429. We therefore denied UPS's petition for review.

**B**

In this case, UPS challenges the Commission's implementation of Sections 3633(a)(1) and (a)(2). In broad terms, UPS believes the Commission is allowing the Postal Service to underprice its competitive products by failing to fully acknowledge that those products drive a yearly spike in costs every December and, in turn, failing to raise those products' price floors accordingly. On May 29, 2020, UPS petitioned the Commission to initiate rulemaking to rectify that alleged problem. J.A. 6–49.

UPS focused on what it termed "peak-season costs." J.A. 8. According to UPS, every holiday season the Postal Service faces increased commercial demand to deliver packages, which are largely competitive products. To meet that demand, the Postal Service incurs "hundreds of millions of dollars" in increased costs. J.A. 46. The Postal Service must, for example, hire "tens of thousands of temporary workers," open "temporary delivery annexes," pay "additional overtime wages," and send "carriers out on a host of additional runs to deliver packages." J.A. 9. In its petition, UPS's core argument was that competitive products "largely, if not exclusively," caused these costs. J.A. 21. As support, UPS presented calculations from consultants purporting to show that, absent the need to deliver competitive products, the Postal Service would not incur these dramatically increased costs. Thus, UPS urged, these peak-season costs are incremental costs of competitive products and must be attributed to those products under Sections 3633(a)(1) and 3633(a)(2). According to UPS, however, the Postal Service's models instead "systematically

shift these costs into institutional costs, which are predominantly covered with market-dominant revenues." J.A. 46. UPS asked the Commission to require the Postal Service to adopt a version of its consultants' methodology and treat the entire peak-season cost increase as incremental costs of competitive products. J.A. 46–47; *see* J.A. 27–29.

The Postal Service acknowledged "that the existence of a seasonal peak in volume can cause seasonal costs" and agreed with UPS that "package volumes are an important part of that peak." J.A. 113. But it disagreed with the rest of UPS's analysis. The Postal Service noted that several other products, including market-dominant products such as First-Class mail, also have significantly increased volumes each December. *See* J.A. 119–21. The Postal Service explained that to the extent that the increased costs were driven by competitive products, the Postal Service had long understood that fact and "has performed, and will continue to perform, appropriate costing exercises to ensure that package volumes bear the seasonal peak costs that they cause." J.A. 113. Its models therefore already "accurately account for peak costs" caused by competitive products. *Id.* According to the Postal Service, UPS's calculations attempting to show that even more of those costs should be attributed to competitive products lacked grounding in "both solid economic theory and actual operational practice" and provided no basis to reject the Postal Service's current cost-attribution approach. *Id*.

On November 29, 2021, after holding a technical conference and accepting written comments on UPS's petition, the Commission denied the petition. *See* J.A. 213–44. The Commission concluded that "UPS has failed to demonstrate that either the attribution of peak-season costs has become significantly inaccurate or the calculation of [c]ompetitive products' incremental cost can be significantly improved by applying the methodology UPS advocates." J.A. 224. The

Commission found that UPS's calculations "contain[] numerous errors and . . . do[] not produce any reliable estimates of peak-season costs." J.A. 225. And the Commission further concluded that the existing cost-attribution framework already accounts for those costs arising from the seasonal spike that are properly attributable to competitive products. *See* J.A. 228–33.

On December 28, 2021, UPS filed a motion for reconsideration. J.A. 245–50. On January 28, 2022, the Commission denied that motion. J.A. 251–57.

UPS petitions for our review of both orders.

## II

We will set aside the Commission's orders if we find them "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); 39 U.S.C. § 3663. Under that standard, we will reverse "only if the agency's decision is not supported by substantial evidence, or the agency has made a clear error in judgment." *Safe Extensions, Inc. v. FAA*, 509 F.3d 593, 604 (D.C. Cir. 2007) (quotation omitted).[1]

We are "reluctant to interfere with [the Commission's] reasoned judgments about technical questions within its area of expertise. . . . In considering whether the orders suffer from arbitrary and capricious decision-making, then, we ask only whether the Commission's exercise of its authority was

---

[1] Although this case involves a denial of a petition for rulemaking, the Commission does not rely on our decisions setting out the particularly deferential standards that apply when we review such denials. *See, e.g.*, *WildEarth Guardians v. EPA*, 751 F.3d 649, 651 (D.C. Cir. 2014). We reject UPS's petition without relying on those standards.

reasonable and reasonably explained." *UPS I*, 890 F.3d at 1066 (cleaned up).

## III

### A

UPS's primary support for its petition was a multistep methodology for estimating peak-season costs and showing that the Postal Service failed to properly attribute those costs to competitive products. UPS asked the Commission to require the Postal Service to deploy a version of that methodology moving forward. *See* J.A. 46–47.

The Commission, however, explained in detail why UPS's methodology was flawed and could not support UPS's claim. First, the Commission explained that UPS erred by using in its calculations the average annual per-unit cost of mail and thereby assuming that the cost of producing each unit of mail is constant throughout the year. *See* J.A. 226–28. In fact, the Commission explained, such costs vary throughout the year "because accrued costs in heavy volume months are higher than in most other months." J.A. 227. The Commission observed that the Postal Service's costing models capture that seasonal variation, but UPS's did not. *See id.*

The Commission also explained that UPS's model suffered from significant internal inconsistencies. For example, the model emphasized increases in certain cost categories but simply ignored a cost segment in its own calculations that showed "an approximately $128 million cost decrease for December." *Id*. The Commission also noted that although "UPS focuses on December volume increases, it [did] not address the fact that volumes also change in other months." *Id*. The Commission credited the Postal Service's expert, who explained that if UPS's methodology were applied to other months, the cost increases UPS identified in December would

be "offset" by January decreases, *id.*, and that UPS's model would produce seemingly anomalous results in other months, J.A. 227–28.

In this court, UPS offers no response to those criticisms of the methodology that formed the foundation for its petition before the agency. Indeed, by its reply brief, UPS explicitly states that it does "not ask[] this Court to accept, or to require the [Commission] to accept, the UPS methodology." Reply Brief 8. UPS, in other words, has abandoned a primary building block of its petition to the agency: that the Postal Service should be required to use UPS's costing methodology.

UPS does continue to rely on certain figures and graphs that it says support the underlying claim that all peak-season costs are caused by competitive products. *See* Petitioner's Brief 7–11, 23–27. Many of those figures document the undisputed fact that the Postal Service's costs spike during the holiday season each year. *See* J.A. 13–20. But in other figures, UPS sought to demonstrate that competitive products "largely, if not exclusively," cause that spike. J.A. 21. For example, one figure purports to show that market-dominant product volumes decrease every December, while competitive product volumes increase. *See* J.A. 23. Another figure overlays the Postal Service's city carrier costs over time with competitive product volumes over time and shows that "competitive product volumes are closely correlated with city carrier costs over time" because "as competitive products volume peaks, so do city carrier costs." *See* J.A. 21.

The Commission addressed these figures and explained why they did not support UPS's claims. In particular, the Commission explained that UPS had failed to defend its graphs' reliance on "indexed average daily volumes instead of the actual volumes." J.A. 230. In its petition, UPS said it calculated these "indexed" measures by taking "monthly

volume totals, divided by delivery days in the month, then indexed to 100 in April 2019." J.A. 23 n.22, 25 n.28. To explain this choice, UPS conclusorily stated that "index numbers or percentage changes are in fact very useful in this context, where the substantially larger workload associated with competitive products makes a piece-based comparison of volume growth meaningless." J.A. 108. The Postal Service's expert responded that indexing accentuates changes in "the growth rates of products with small volumes"—such as certain competitive products. J.A. 230 (quotation omitted). "This is because small volumes can have large percentage changes." *Id.* (quotation omitted). As a result, the expert concluded that UPS's key graphs exaggerated the spike in competitive volumes in December. *Id.*

The Commission agreed with the Postal Service's expert and concluded that the graphs did not depict volumes in a way that permitted inferences about causality rather than mere correlation. *Id.* Further, the Commission noted that UPS's graphs ran contrary to other evidence suggesting that market-dominant products had a significant volume increase in December and therefore were at least substantially responsible for the increased costs. J.A. 229–31; *see, e.g.*, J.A. 230 ("First-Class Mail also has a December volume peak[,] and its share of the Postal Service's volume is much larger than the Competitive products' share.").

On appeal, UPS provides a very limited response to the Commission's critique. UPS's opening brief does not respond to the indexing concern at all. In reply, UPS states that indexing does not "accentuate[] changes in small-volume products," Reply Brief 5, because it "looks at the seasonal change in volume for *all* market-dominant products together," *id.* at 6. We generally do not address arguments raised for the first time in a reply brief. *Rollins Env't Servs., Inc. v. EPA*, 937 F.2d 649, 652 n.2 (D.C. Cir. 1991). But even if that explanation

were timely and correct, it is not clear how it would justify UPS's bottom-line choice to present indexed volumes instead of actual volumes. Without a clearer explanation from UPS, we have no reason to question the Commission's expert judgment that the graphs do not establish that competitive products are solely responsible for peak-season cost increases. That is particularly so given that UPS presented these graphs as supplemental support for the point supposedly proven by its more comprehensive methodology, which UPS no longer seeks to defend.

**B**

As another way of raising substantially the same argument that the Postal Service's costing models do not attribute enough of the seasonal cost spike to competitive products, UPS next asserts that the Postal Service's models problematically create a category of "unexplained costs." *See* J.A. 27–32. "Unexplained costs" is UPS's term for costs that it thinks are caused by competitive products in December but are not attributed to competitive products under the incremental-cost approach. In its petition, UPS used its methodology to calculate a yearly average of more than $500 million in "unexplained costs." *See* J.A. 30. As we have explained, the Commission rejected that methodology, and UPS abandons it on appeal. UPS nevertheless insists that the Commission itself has conceded that there are nearly $250 million in such costs. Petitioner's Brief 28.

UPS misunderstands the Commission's position. The Commission's order clarified that these costs "are not unexplained" at all. J.A. 231. Instead, they are the costs that, using the Commission's longstanding "multi-step" incremental-cost analysis, "cannot be specifically attributed to products through reliably identified causal relationships" and

are therefore treated as institutional costs using the approach we approved in *UPS I*. *Id.* (quotation omitted).

UPS claims that the Commission "provides no rationale for why the seasonal cost spike goes into institutional costs rather than incremental costs." Petitioner's Brief 30. Not so. Part of the seasonal cost spike is captured and attributed to competitive products using the Postal Service's existing methodology. J.A. 229; *see also* J.A. 10, 29–31 (UPS acknowledging the same in its petition to the Commission). The remaining portion of the seasonal spike is treated as "institutional costs" because those are the costs that the Postal Service's "multi-step approach" identifies as not capable of being attributed to any specific products. J.A. 231. For example, crediting the Postal Service's expert, the Commission explained that these costs include network costs and costs associated with broad groupings of products—not just competitive products. J.A. 232. These costs, based on the Postal Service's calculations, "would not disappear if any groups of individual products were discontinued." *Id.* UPS's only rejoinder is that the Postal Service's calculations are wrong, and that these costs would in fact "disappear if competitive products were discontinued." Petitioner's Brief 30. But that assertion rests on the methodology and figures the Commission found unreliable and reasonably declined to credit.

UPS also raises a technical argument to suggest that the Postal Service's costing methodology is not capable of accurately assessing which peak-season costs are attributable to competitive products. UPS argues that because the Postal Service relies on "annual totals" of product volumes in its costing models, its costing models overlook that increased package volumes in December cause unique costs "that would not be the same if that increase were spread throughout the year." *Id.* The Commission explained, however, that the

costing methodology uses not only annual totals but also "distribution keys" that are calculated on a quarterly basis. J.A. 228 (quotation omitted). Distribution keys are a method of identifying "the share of each" category of costs "that each product is responsible for generating," and we approved their use in *UPS I*. 890 F.3d at 1056. In its opening brief, UPS does not address that reliance on quarterly distribution keys. *See* Petitioner's Brief 30–31. UPS's effort to do so on reply is both conclusory and comes too late. *See* Reply Brief 10–11; *Rollins Env't Servs.*, 937 F.2d at 652 n.2.

## C

UPS next asserts that the Postal Service's incremental-cost methodology fails to assess what costs would disappear if the Service stopped offering all competitive products and thus fails to implement Section 3633(a)(1). UPS claims that the Postal Service's method of assessing incremental costs "assumes that the Postal Service has fixed operations that do not significantly change in response to the addition of competitive product volumes." Petitioner's Brief 32. Because of this fixed-operations assumption, UPS argued that the "Commission has not yet evaluated the full set of costs the Postal Service could eliminate through an efficient reorganization of its delivery network and other aspects of its operations, if it ceased delivering competitive products." J.A. 10. UPS claims that the "magnitude of this error . . . grows every year as package delivery" encompasses a larger portion of the Postal Service's business. Petitioner's Brief 33.

The Commission explained, however, that the Postal Service's incremental-costs approach is specifically designed to estimate how postal costs would change if the Postal Service stopped delivering competitive products. *See* J.A. 234–37. The Postal Service measures incremental costs using an activity-based costing methodology, which groups costs by

Postal Service activities rather than products, and then apportions activities' costs among products. In *UPS I*, we generally approved this methodology as a way of calculating competitive products' incremental costs. *See* 890 F.3d at 1069. And as the Commission explained, contrary to UPS's argument, this approach does not just measure costs attributable to individual products; it has been repeatedly modified to "expand[] the category of attributable costs" to ensure they are "calculated at the highest level of aggregation for which they can be estimated reliably." J.A. 236. UPS claims that the Postal Service's assessment of incremental costs for competitive products collectively is only "marginally greater" than the sum of costs for each individual competitive product. Petitioner's Brief 32. But if UPS is right that the Postal Service's approach assumes offering at least some competitive products, there would be no difference at all. UPS has presented no concrete basis for this court to second-guess the agency's judgment that the Postal Service is appropriately calculating incremental costs.

At bottom, the Commission found that the Postal Service is "well aware" of its obligation to account for peak-season costs in setting prices and "perform[s] . . . appropriate costing exercises to ensure that package volumes bear the seasonal peak costs that they cause." J.A. 229 (quotation omitted). Although the Commission reasonably found that UPS had identified no basis to upend the Postal Service's existing costing methodology, it nevertheless acknowledged that certain of UPS's technical concerns were "worthy of further consideration." J.A. 240. The Commission accordingly initiated a new docket to "explore the opportunities to update" a particular costing model critiqued by UPS, J.A. 241, asked the Postal Service to "generate" new "datasets," *id.*, and encouraged the Postal Service to expedite other improvements in its allocation of peak-season costs, J.A. 239–42. The

Commission's position on the issues UPS presented is both reasonable and reasonably explained.

## IV

UPS also argues on appeal that the Commission erred by failing to consider whether peak-season costs are institutional costs "uniquely or disproportionately associated" with competitive products. 39 U.S.C. § 3633(b). But UPS's only mention of this issue before the Commission was a footnote stating the issue would be addressed "in greater detail" in the separate proceeding on remand from *UPS II*. J.A. 12 n.5. The issue is therefore not properly presented in this case. *Appalachian Power Co. v. EPA*, 251 F.3d 1026, 1036 (D.C. Cir. 2001) ("An objection must be made with sufficient specificity reasonably to alert the agency." (quoting *Tex Tin Corp. v. EPA*, 935 F.2d 1321, 1323 (D.C. Cir. 1991))). In any event, UPS raised those arguments in the companion case, and they have been addressed. *See UPS III*, 96 F.4th 422.

## V

For the foregoing reasons, we deny the petition for review.

*So ordered.*