# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 22, 2018         Decided May 22, 2018

No. 16-1354

UNITED PARCEL SERVICE, INC.,
PETITIONER

v.

POSTAL REGULATORY COMMISSION,
RESPONDENT

VALPAK FRANCHISE ASSOCIATION, INC., ET AL.,
INTERVENORS

———

Consolidated with 16-1419

———

On Petitions for Review of Orders
of the Postal Regulatory Commission

———

*Jeffrey A. Lamken* argued the cause for petitioner. With him on the briefs were *James A. Barta*, *Steig D. Olson*, and *Sara E. Margolis*.

*Bryan N. Tramont* and *Craig E. Gilmore* were on the brief for *amicus curiae* J. Gregory Sidak in support of petitioner.

*Michael Shih*, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief were

*Michael S. Raab*, Attorney, *David A. Trissell*, General Counsel, Postal Regulatory Commission, and *Christopher J. Laver*, Deputy General Counsel.

*Morgan E. Rehrig* and *Eric P. Koetting*, Attorneys, U.S. Postal Service, *Peter DeChiara*, *David M. Levy*, *John F. Cooney*, and *James Pierce Myers* were on the brief for intervenors in support of respondent.

Before: TATEL, SRINIVASAN, and PILLARD, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: The U.S. Postal Service holds congressionally authorized monopoly power over the market for some of its products, like first-class mail delivery, but for other products, like parcel post, it competes with private companies. To promote fair competition, Congress tasked the Postal Regulatory Commission with ensuring that the Postal Service sets competitive products' prices high enough to cover all "costs attributable to [those] product[s] through reliably identified causal relationships." 39 U.S.C. § 3631(b); *see also id.* § 3633(a)(2). In two 2016 orders, the Commission directed the Postal Service to include among the "costs attributable" to competitive products those costs that would disappear were the Postal Service to stop offering those products for sale. United Parcel Service, Inc., which competes with the Postal Service, petitions for review of both orders, arguing that the cost attribution methodology the Commission embraced is both inconsistent with the statute that gives the Commission its regulatory authority and arbitrary and capricious. For the reasons that follow, we deny the petitions.

**I.**

Congress created what is now the Postal Regulatory Commission (the "Commission") in 1970 to oversee the U.S. Postal Service's efforts to set "reasonable and equitable rates of postage and fees for postal services." Postal Reorganization Act, Pub. L. No. 91-375, § 3621, 84 Stat. 719, 760 (1970) (codified as amended at 39 U.S.C. § 404(b)); *see also id.* § 3601, 84 Stat. at 759 (establishing the Commission). The 2006 Postal Accountability and Enhancement Act (the "Accountability Act"), Pub. L. No. 109-435, 120 Stat. 3198 (2006), provides the framework within which the Commission currently exercises this oversight authority.

Under the Accountability Act, all Postal Service products are either "market-dominant" or "competitive." *See* 39 U.S.C. § 3642(b)(1). Market-dominant products are those over which "the Postal Service exercises sufficient market power that it can effectively" raise prices or decrease quality "without risk of losing a significant level of business to other firms offering similar products." *Id.* To prevent the Postal Service from "improperly leverag[ing]" this market power, *U.S. Postal Service v. Postal Regulatory Comm'n*, 785 F.3d 740, 744 (D.C. Cir. 2015), the Act requires the Commission to limit rate increases for market-dominant products, *see* 39 U.S.C. §§ 3622(a), (d)(1); *see also* 39 C.F.R. §§ 3010.1–3010.66 (implementing this mandate).

Different concerns attend competitive products—products over which "the Postal Service faces meaningful market competition." *U.S. Postal Service*, 785 F.3d at 744. For such products, Congress wished to "ensure that the Postal Service competes fairly," S. Rep. No. 108-318, at 15 (2004) ("Senate Report")—that is, without using revenues from market-dominant products subject to its monopoly power to defray costs competitive products would otherwise have to be priced

to cover. The Accountability Act therefore requires the Commission to promulgate regulations that "prohibit the subsidization of competitive products by market-dominant products," 39 U.S.C. § 3633(a)(1); "ensure that each competitive product covers its costs attributable," *id.* § 3633(a)(2), defined as "the direct and indirect postal costs attributable to such product through reliably identified causal relationships," *id.* § 3631(b); and "ensure that all competitive products collectively cover what the Commission determines to be an appropriate share of the institutional costs of the Postal Service," *id.* § 3633(a)(3).

In effect, the Accountability Act subjects each competitive product to a "price floor," *U.S. Postal Service v. Postal Regulatory Comm'n*, 842 F.3d 1271, 1272 (D.C. Cir. 2016) (per curiam), which must be set high enough to cover both that product's "costs attributable," 39 U.S.C. § 3633(a)(2), and a portion of the Postal Service's "institutional costs," *id.* § 3633(a)(3), which the Commission construes to mean "residual costs," *i.e.*, all costs that are not costs attributable, *see* Order Concerning United Parcel Service, Inc.'s Proposed Changes to Postal Service Costing Methodologies (UPS Proposals One, Two, and Three), No. RM2016-2, at 10 (Postal Regulatory Comm'n Sept. 9, 2016) (updated Oct. 19, 2016) ("Order").

This case concerns the Commission's rules for apportioning postal costs between "attributable" and "institutional" costs. 39 U.S.C. §§ 3633(a)(2), (a)(3). Treating the latter category as "residual" of the former, Order at 10, Commission regulations focus on identifying which costs are "attributable to [a specific] product through reliably identified causal relationships," 39 U.S.C. § 3631(b). In doing so, the Commission distinguishes (albeit necessarily imperfectly) between "fixed costs," such as executive salaries, which remain

constant regardless of overall product volume, and "variable costs," such as wage labor or raw materials, which vary with the Service's production levels. Order at 6; *see also* Responses of the United States Postal Service to Questions 1–4 of Chairman's Information Request No. 2, No. RM2016-2, at 11 n.9 (Postal Regulatory Comm'n Dec. 10, 2015) ("Postal Service Responses") (acknowledging that "fixed costs can be difficult to identify in practice"). Except for certain product-specific costs not at issue, fixed costs are not attributed to particular products and so are considered institutional. *See* Order at 9 & n.12 (attributing only those fixed costs "that are uniquely associated with an individual product," *id.* at 9, such as product-specific advertising costs). The issue here is what portion of the Postal Service's *variable* costs can be reliably attributed.

Broadly speaking, the Postal Service, in implementing Commission regulations, attributes variable costs on an activity-by-activity basis. After drawing up a list of the discrete production activities, such as highway transportation, that collectively account for its total variable costs, the Postal Service calculates what share of each activity's costs can be attributed to each product. *See* Order App'x A at 13–14 (laying out this process); Postal Regulatory Comm'n, *FY16 Public Cost Segments and Components Report* (2016), https://go.usa.gov/x54x2 (listing production activities). To perform this calculation, it first identifies an activity's "cost driver," defined as the unit of measurement that best captures the activity's "essen[ce]." Order App'x A at 14. For example, highway transportation is measured in cubic-foot-miles, such that one "unit" of cost driver in this context represents one cubic foot of mail being transported one mile. *See id.* Then, the Postal Service determines the share of each activity's cost-driver units that each product is responsible for generating, typically by conducting worksite observations in order to

produce a "distribution key" that, like a pie chart, illustrates an activity's product-by-product breakdown. *See id.* at 9; *see also* Order at 9 n.14; Office of Inspector General, U.S. Postal Service, *A Primer on Postal Costing Issues* 17–18 (Mar. 20, 2012), https://go.usa.gov/x54Dd (explaining the role of distribution keys).

The present dispute stems from the uncertainty inherent in translating this product-by-product breakdown of activity *quantity* into a similar breakdown of activity *costs*, given the cost savings that accrue as total production volume increases. If every cost-driver unit were equally costly, the distribution keys could be used to apportion *all* an activity's costs to specific products: a product responsible for 5% of the cubic-foot-miles accrued in highway transportation, for example, could be linked to 5% of that activity's costs. But not all cost-driver units are created equal. Under the principle of diminishing marginal costs, the cost of adding each new unit—in economic parlance, that unit's "marginal cost"—decreases as production quantity increases, due to the efficiency gains that result from scaling up operations. *See* Order at 35 ("As a result of economies of scale and scope, the marginal cost of individual units of volume . . . decreases with volume."); *see also* Order App'x A at 2 (defining marginal cost). To transport one cubic foot of mail, for instance, the Postal Service must make an initial outlay to hire a driver and maintain a truck. But throwing a second cubic foot of mail onto the truck carries fewer additional costs, and a third cubic foot carries fewer still. Given this variability, introducing a new product line that increases the Postal Service's total cubic-foot-mileage by 5% may well increase highway transportation costs by something *less than* 5%. Due to diminishing marginal costs, therefore, the share of cost-driver units a particular product generates might not determine the share of costs that can be reliably linked to that product.

Historically, the Commission dealt with this uncertainty by directing the Postal Service to attribute to specific products only that portion of an activity's costs that would result if every cost-driver unit cost only as much as the unit with the lowest marginal cost. Put into agency lingo, the Commission had the Postal Service attribute only an activity's "volume-variable cost[s]," defined as the marginal cost of the "last," *i.e.*, cheapest, cost-driver unit, multiplied by the total number of units accrued. Order at 36 n.56; *see also id.* at 9. A Commission graph, reproduced below as Figure 1, illustrates volume-variable costs. The downward-sloping curve shows a hypothetical activity's diminishing marginal cost (marked on the vertical axis) as production quantity (marked on the horizontal axis, and measured in cost-driver units) increases. The shaded rectangle represents this activity's volume-variable costs—the $1 marginal cost of the twentieth cost-driver unit, applied to all twenty units.

**Figure 1**



Order App'x A at 15 fig. A-7.

Given that every cost-driver unit contributes an identical dollar amount to an activity's volume-variable costs, the Postal Service, in attributing only these costs, could securely rely on

its distribution keys and assign each product a share of volume-variable costs equivalent to that product's contribution to cost-driver quantity. For example, consider a truck carrying six cubic feet of mail—two cubic feet each of letters, postcards, and parcels—for one mile. Imagine too that the marginal cost of the first cubic-foot-mile is $60, the marginal cost of the second is $50, the marginal cost of the third is $40, and so forth. The activity's volume-variable costs are $60, or the marginal cost of the "final" cubic-foot-mile ($10) multiplied by the total number of cubic-foot-miles (six). Because letters, postcards, and parcels each account for one-third of the cost-driver units, volume-variable costs can be apportioned among them in like manner, with one-third of those costs ($20) attributed to each product.

As this example shows, the Commission's historic approach left some variable costs unattributed to any one product. Although the volume-variable costs in this example amount to only $60, total highway transportation costs are $210 ($60 plus $50 plus $40 plus $30 plus $20 plus $10). The remaining $150 left unattributed represents "variable costs that are not volume-variable costs." Order at 35. The Commission calls these "inframarginal costs." *Id.* These costs can be visualized as the white space in Figure 1 that lies between the downward-sloping marginal cost curve and the shaded rectangle that represents volume-variable costs. Historically, the Commission classified all inframarginal costs as institutional costs, only a limited share of which competitive products are obliged to cover. *See id.* at 10; 39 C.F.R. § 3015.7(c) (setting competitive products' minimum collective share of the Postal Service's institutional costs at 5.5%).

Dissatisfied with this approach, United Parcel Service, Inc. (UPS), which runs a parcel delivery service that competes with the Postal Service's, petitioned the Commission in 2015 "to

initiate rulemaking proceedings to change how the United States Postal Service accounts for the costs of competitive products." Petition of United Parcel Service, Inc. for the Initiation of Proceedings to Make Changes to Postal Service Costing Methodologies, No. RM2016-2, at 1 (Postal Regulatory Comm'n Oct. 8, 2015); *see also* 39 C.F.R. § 3050.11(a) (authorizing "any interested person" to submit such a petition). By classifying inframarginal costs as institutional costs, UPS argued, the Postal Service had been shifting "nearly all of the cost savings of [its] economies of scale and scope" to competitive products, *see* Proposal One—A Proposal to Attribute All Variable Costs Caused by Competitive Products to Competitive Products Using Existing Distribution Methods, No. RM2016-2, at 15 (Postal Regulatory Comm'n Oct. 8, 2015), enabling it to "compete unfairly" against private companies, like UPS, that are unable to offset their competitive products' inframarginal costs by wielding monopoly pricing power elsewhere, *id.* at 14. Seeking to spur the Postal Service to increase its competitive products' prices, UPS urged the Commission to require that all inframarginal costs be attributed to specific products. *See id.* at 1.

UPS proposed a two-step process for performing this attribution. The Postal Service would first calculate each production activity's inframarginal costs, and then apportion those inframarginal costs among products according to the distribution keys that show what proportion of cost-driver units each product generates. *See id.* at 19–21. By way of example, recall our mail truck that carries two cubic feet each of letters, postcards, and parcels, and that incurs $60 in volume-variable costs and $150 in inframarginal costs. Because the three products account for equal quantities of cost driver, UPS's proposal would attribute inframarginal costs, like volume-variable costs, equally among them. In this scenario, the highway transportation costs attributable to each product

would be $70—one-third of the $60 in volume-variable costs ($20) plus one-third of the $150 in inframarginal costs ($50)—with no remaining variable costs left to be classified as institutional. With inframarginal costs thus attributed, the Postal Service would need to raise competitive products' rates to comply with its duty to "ensure that each competitive product covers its costs attributable," 39 U.S.C. § 3633(a)(2), leaving UPS in a stronger market position.

The Commission rejected UPS's proposal in a September 2016 order, finding that it relied on "unverifiable assumptions" for both "the calculation and allocation of inframarginal costs." Order at 55–56. As to calculation, the Commission explained that a central assumption underlying UPS's model for estimating a production activity's total inframarginal costs "lack[ed] an empirical basis." *Id.* at 39. As to allocation, the Commission faulted the proposal's use of distribution keys to determine any given product's share of an activity's inframarginal costs, believing that such an approach relied on the unsupported assumption "that the proportion of inframarginal costs incurred by that product is identical to the proportion of the cost driver [generated by] that product." *Id.* at 51. Accordingly, the Commission concluded, UPS's proposal was inconsistent with the Accountability Act's directive to attribute only those costs that can be linked to a particular product "through reliably identified causal relationships." 39 U.S.C. § 3631(b); *see also* Order at 56 ("[UPS's proposal] fails to reliably identify a causal relationship . . . between all of the inframarginal costs it seeks to attribute and products.").

Having rejected UPS's request that *all* inframarginal costs be attributed to individual products, the Commission then considered whether *some* such costs could nonetheless be reliably attributed. In particular, the Commission observed that

in the course of fulfilling its separate statutory obligation to "prohibit the subsidization of competitive products by market-dominant products," 39 U.S.C. § 3633(a)(1), it had earlier approved a method that could be used to calculate a competitive product's "incremental cost," defined as "the difference between the [Postal Service's] total costs . . . and the total costs without [that] product," Order at 58; *see also id.* at 12–14 (describing the development of the incremental-cost methodology). Because a product's incremental cost is the amount by which total costs would decrease had the cost-driver units associated with that product never been accrued, it encompasses not only that product's share of volume-variable costs, but also the "inframarginal costs that would be removed" if the product "were not to be provided." Order App'x A at 19. In effect, the incremental-cost methodology attributes to a product responsible for 5% of an activity's cost-driver units the total cost—both volume-variable and inframarginal—of the "last," *i.e.*, cheapest 5% of those units.

To illustrate, consider one last time the truck that carries six cubic feet of assorted mail and incurs $60 and $150 of, respectively, volume-variable and inframarginal costs. What happens if the driver removes the two cubic feet of parcels before the truck sets off? In that case, the truck would carry only four cubic feet of mail, for a total cost of $180—$60 plus $50 plus $40 plus $30. The incremental cost of parcels is $30, or the difference between the $210 in total costs incurred when parcels are included and the $180 incurred when they are not. This $30 includes parcels' one-third share of highway transportation's volume-variable costs, or $20, as well as the $10 in inframarginal costs that would not have been incurred but for the fifth and sixth cubic feet of mail.

Here, the Commission concluded that because "the portion of inframarginal costs" included within a product's incremental

cost has "a causal relationship" with that product, Order at 55, the Accountability Act "require[s] the Postal Service to attribute" it, *id.* at 61. In December 2016, the Commission adopted final rules formalizing this requirement. *See* Changes to Attributable Costing, 81 Fed. Reg. 88,120, 88,123 (Postal Regulatory Comm'n Dec. 7, 2016). Those rules define a competitive product's "attributable costs" as "the sum of its volume-variable costs, product-specific costs, and those inframarginal costs calculated as part of [its] incremental costs." *Id.* (codified at 39 C.F.R. § 3015.7(b)). All other costs, including all remaining inframarginal costs, remain classified as institutional.

**Figure 2**



Petitioner's Br. 37 (adapting Order App'x A at 18 fig. A-9).

The parties have produced a helpful graphic depiction of the Commission's new incremental-cost approach, reproduced above as Figure 2. The shaded area represents the incremental cost of a product that is responsible for a share of a hypothetical activity's cost-driver units. This area includes not only a corresponding share of the activity's volume-variable costs—the only costs that would have been attributed to the product

under the Commission's prior approach—but also the inframarginal costs associated with the "final," lowest-priced share of cost-driver units, which are included among the product's costs attributable under the new approach.

The approach the Commission adopted under the 2016 orders is responsive to UPS's complaint that the historic approach, by attributing *no* inframarginal costs, left unattributed some costs that could be reliably linked to specific products. It differs from UPS's proposed approach, however, in that it attributes to a product responsible for $x$% of a given activity's cost-driver units only those inframarginal costs associated with the lowest-priced $x$% of units, rather than, as UPS would prefer, $x$% of that activity's total inframarginal costs.

Unhappy with its partial victory, UPS petitioned this court for review of the 2016 orders, arguing that the Commission's decision not to require the Postal Service to attribute *all* inframarginal costs to specific products was both inconsistent with the Accountability Act and arbitrary and capricious. *See* 39 U.S.C. § 3663 (establishing that Commission orders are reviewed under 5 U.S.C. § 706, which directs courts to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A)). Economist J. Gregory Sidak has filed an *amicus* brief supporting UPS, and a quartet of intervenors—Amazon Fulfillment Services, Inc.; National Association of Letter Carriers, AFL-CIO; Parcel Shippers Association; and the U.S. Postal Service—has filed a brief supporting the Commission.

In Part II, we consider whether the challenged orders are, as UPS claims, contrary to the Accountability Act. In Part III, we consider UPS's argument that the orders reflect arbitrary and capricious decision-making. We are grateful to counsel for

both sides for their excellent briefs and fine oral argument, which have helped us considerably.

## II.

UPS presses two statutory arguments as to why, in its view, the challenged orders conflict with the Accountability Act. We reject both.

## A.

UPS first argues that the Commission's classification of all inframarginal costs not included in a product's incremental cost as "institutional costs," 39 U.S.C. § 3633(a)(3), is inconsistent with that term's unambiguous meaning, *see Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842–43 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."). According to UPS, "institutional costs" unambiguously refers to "costs, such as overhead and executive compensation, associated with operating the Postal Service *as an establishment*, independent of production," Petitioner's Br. 35, and so excludes all variable costs, including inframarginal costs.

Even though the Accountability Act nowhere defines "institutional costs," it does define the complementary category of "costs attributable." 39 U.S.C. § 3631(b). Because UPS never disputes the Commission's view that "[a]ll Postal Service costs are . . . either attributable or institutional," Order at 9, it must believe that all variable costs—in its view, unambiguously excluded from "institutional costs"—are "attributable" under the statute. But UPS offers no basis for believing that the Accountability Act unambiguously compels the Commission to treat each variable cost as a "cost[] attributable" without first considering whether it possesses the

statutorily requisite "reliably identified casual relationship[]" with any one product. 39 U.S.C. § 3631(b).

Instead, UPS hinges its argument on three pieces of evidence that, it says, establish unambiguously that "institutional costs" exclude variable costs. First, it cites a dictionary that defines "institutional" to mean "of, relating to, involving, or constituting an institution." Petitioner's Br. 34–35 (quoting *Webster's Third New International Dictionary* 1171 (2002)). This definition, however, is fully consistent with classifying some variable costs as institutional. Variable postal costs, such as the hourly wages of employees who deliver the mail, "relate to" the Postal Service no less than do fixed postal costs, such as the Postmaster General's annual salary. UPS next cites its own *amicus*'s statement in a law review article that "[i]nstitutional costs are fixed overhead and capital costs that are not volume-sensitive." *Id.* at 36 (emphasis omitted) (quoting J. Gregory Sidak & Daniel F. Spulber, *Monopoly and the Mandate of Canada Post*, 14 Yale J. on Reg. 1, 56 (1997)). But this lone characterization—which itself cites no authority—falls far short of demonstrating that UPS's definition of "institutional costs" is so universally accepted that Congress must have adopted it. Finally, UPS cites the Act's Senate Report, which refers to "salaries for management and other overhead costs" as examples of "institutional costs." *Id.* at 35 (quoting Senate Report at 9). That Congress intended the term to include some fixed costs, however, hardly compels the conclusion that it intended the term to exclude all variable costs.

With no indication that the statute requires UPS's reading, we are left to ask whether the Commission's own interpretation is "permissible," deferring to the agency under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984), if it is. *U.S. Postal Service*, 785 F.3d at 750

(quoting *Chevron*, 467 U.S. at 843). As we have explained, the Commission understands the undefined category of "institutional costs" to consist of all "residual" Postal Service costs, fixed or variable, that fall outside the statutory definition of "attributable" costs. Order at 9–10. In addition to its consistency with statutory structure, this reading gains support from the established meaning "institutional costs" held in the postal ratemaking context long prior to the Act's 2006 enactment. As early as 1975, the Commission observed that "the Postal Service considers certain costs . . . to be attributable" and that "[a]ll other costs are classified as institutional." Opinion and Recommended Decision, No. R74-1, at 99 (Postal Rate Comm'n Aug. 28, 1975). And since then, the Commission has continued to conceive of "the institutional cost pool" as "[t]he remaining portion" of total costs after attributable costs are subtracted. *See United Parcel Service, Inc. v. U.S. Postal Service*, 184 F.3d 827, 842 (D.C. Cir. 1999) (per curiam) (alteration in original) (internal quotation marks omitted) (quoting Opinion and Recommended Decision, No. R97-1, at 220 (Postal Rate Comm'n May 11, 1998)).

The Commission's interpretation of the Accountability Act in line with this longstanding usage is perfectly reasonable under *Chevron*. We typically presume that Congress is "aware of established practices and authoritative interpretations of the coordinate branches," *United States v. Wilson*, 290 F.3d 347, 357 (D.C. Cir. 2002), and here the Act's legislative history confirms that the enacting Congress knew the Commission took "institutional costs" to mean those costs that "cannot be attributed to any specific product," Senate Report at 9. One could reasonably infer that, in employing a known term of art in the statute, "Congress intended it to have its established meaning." *McDermott International, Inc. v. Wilander*, 498 U.S. 337, 342 (1991).

UPS challenges the idea that the meaning the Commission now assigns to "institutional costs" has such a consistent pedigree in the postal ratemaking context that the agency could reasonably construe the Accountability Act to accommodate it. UPS's evidence of inconsistency is underwhelming. It first points to a Postal Service publication stating that institutional costs "can be considered common costs or overhead costs needed for overall operations," but that same publication, consistent with longstanding practice, defines institutional costs as those "[p]ostal costs that cannot be directly or indirectly assigned to any mail class or product," and then expressly contrasts such costs with "attributable cost[s]." U.S. Postal Service, *Glossary of Postal Terms* 104 (2013), https://about.usps.com/publications/pub32.pdf. Next, UPS pulls a sentence from a 2012 Commission order saying that "institutional costs do not vary with volume." Order Reviewing Competitive Products' Appropriate Share Contribution to Institutional Costs, No. RM2012-3, at 23 (Postal Regulatory Comm'n Aug. 23, 2012) ("2012 Order"). But this remark, which appeared well *after* the Accountability Act's passage and so could not have informed Congress's meaning, was made in passing in connection with an issue that had "not [been] raised by the parties" to that agency proceeding. *Id.* Even if UPS is correct that this stray sentence in a single agency order conflicts with the meaning the Commission has long and repeatedly assigned "institutional costs," it hardly follows that it was unreasonable for the Commission to interpret the Accountability Act to be consistent with that longstanding meaning.

Finally, UPS emphasizes that the Commission's approach leaves nearly half the Postal Service's costs in the "institutional costs" category. True enough, but UPS has failed to show why reading "institutional costs" to permit this outcome is unreasonable under the statute. Indeed, in passing the

Accountability Act, Congress found "no reason for changing" existing attribution standards, Senate Report at 10, under which, it recognized, institutional costs made up "40 percent of the Postal Service's costs," *id.* at 9; *see also Newsweek, Inc. v. U.S. Postal Service*, 663 F.2d 1186, 1200 (2d Cir. 1981) ("There is nothing in the legislative history [of the Accountability Act's predecessor statute] to suggest that attribution of fifty percent of postal costs is inadequate.").

Given our conclusion that the Commission's reading of "institutional costs" is reasonable and so merits our deference, we need not consider the Commission's argument that, under *Chevron*, its reading is not only permissible, but also unambiguously correct.

**B.**

UPS next argues that the Commission's orders give no effect to the word "indirect" in the Accountability Act's requirement that a product's "costs attributable" include the "direct and indirect postal costs attributable to such product through reliably identified causal relationships." 39 U.S.C. § 3631(b). Contending that "[i]ndirect costs are costs that are jointly caused by multiple products," Petitioner's Br. 39, UPS argues that because the Commission's methodology attributes only those costs that are "caused by providing a specific product," Order at 52, that methodology will attribute no "indirect" costs and so is "not in accordance" with the Act, 5 U.S.C. § 706(2)(A). In addressing this argument, we assume without deciding that, as UPS contends, the statute's reference to "direct and indirect" costs means that the Commission may lawfully adopt an attribution formula only if the formula assigns at least some "indirect" costs to specific products.

Even if UPS has correctly interpreted "indirect postal costs" to mean joint costs, the Commission has reasonably

concluded that its approach in fact attributes some such costs. *See U.S. Postal Service*, 785 F.3d at 750 (where statute's meaning is not at issue, court asks whether "the Commission's exercise of its authority [was] 'reasonable and reasonably explained'" (quoting *Manufacturers Railway Co. v. Surface Transportation Board*, 676 F.3d 1094, 1096 (D.C. Cir. 2012))). Observing that both volume-variable and inframarginal costs "contain common costs," Order at 50, defined as "costs that are shared by multiple products but do not directly vary with any of those individual products," *id.* at 7, the Commission explained that its new cost-attribution methodology "do[es] not exclude all common costs, but only those without a reliably identified causal relationship to [a specific] product," *id.* at 52.

For example, the cost of fueling a truck that delivers letters and parcels may, we think, be viewed as a common cost. It is "shared by" the two products that contribute to it, but it "do[es] not directly vary" with either product: the amount by which it rises (or falls) when mail is added to (or taken from) the truck is unaffected by whether that mail consists of letters, parcels, or some combination. *Id.* at 7. The mere fact that the Commission is capable of calculating how much the truck's fuel costs would decrease in the absence of parcels (or, importantly, in the absence of an identical volume of letters) does not change the characteristics that make those fuel costs "common." The orders, therefore, lay out an attribution methodology that the Commission reasonably understands to be consistent with even UPS's own view of the statute.

In any event, the Commission does not agree that "indirect postal costs," 39 U.S.C. § 3631(b), refers only to joint costs. In rejecting UPS's "perceived definition of indirect costs," Order at 32, the Commission contemplated that indirect costs can include the costs of those single-product production activities "that contain support activities," *id.* at 103, and that—in

consequence—are only "indirectly linked to the volume of the product that cost was incurred to produce," Respondent's Br. 50; *see also* Intervenors' Br. 16 ("At least since the mid-1970s, the term 'indirect postal costs' has referred . . . [to] costs that vary with other costs."). These costs would include, for example, the cost of hiring supervisors to oversee employees who sort parcels: the number of supervisors needed depends on the number of employees, which in turn depends on the volume of parcels. *See, e.g.*, Direct Testimony of Joe Alexandrovich on Behalf of U.S. Postal Service, No. 97-1, at 3 (Postal Rate Comm'n July 10, 1997) ("Alexandrovich Testimony"); Direct Testimony of Howard S. Alenier on Behalf of U.S. Postal Service, No. R80-1, at 6 n.1 (Postal Rate Comm'n Apr. 21, 1980) ("Alenier Testimony"). Supervisors' wages are thus a product-specific cost that varies only indirectly with volume— the sort of cost that the Postal Service calls a "piggyback" cost. *See* Postal Regulatory Comm'n, *Financial Analysis of United States Postal Service Financial Results and 10-K Statement* 49 (Mar. 31, 2017) ("*Financial Analysis*"), https://go.usa.gov/x5kWz (describing a product's "indirect cost[s]" as those that are "piggybacked to the direct cost").

The Commission's reading of "indirect postal costs" to include this sort of single-product piggyback cost is reasonable. Past testimony before the Commission has, after all, repeatedly confirmed that "indirect costs," in the specific context of postal accounting, has long included costs that vary only indirectly with product volume due to the presence of an intermediate factor. *See, e.g.*, Alexandrovich Testimony at 3 ("Direct and indirect variable costs are terms distinguishing whether or not there is at least one intervening link between cost and volume."); Alenier Testimony at 6 ("The terms direct and indirect [cost] indicate whether or not at least one intermediate element links cost to volume." (footnote omitted)).

UPS argues that the statute forecloses the Commission's reading, but here too its evidence is insufficient. It first notes the Supreme Court's observation that a study upon which Congress relied in enacting a predecessor statute defined indirect costs as "[t]hose elements of cost which cannot unequivocally be associated with a particular output or product." *National Ass'n of Greeting Card Publishers v. U.S Postal Service* ("*NAGCP*"), 462 U.S. 810, 827 n.21 (1983) (alteration in original) (internal quotation marks omitted). This definition, however, is not necessarily inconsistent with the Commission's view that indirect costs include those that are associated only indirectly with product volume, or "output," even if they can be associated with a single "product." *Id.* Next, UPS cites a federal accounting regulation, which actually supports the Commission's reading because it defines "[i]ndirect cost" as a cost "identified with two or more final cost objectives *or with at least one intermediate cost objective*," 48 C.F.R. § 9904.418-30(a)(3) (emphasis added), such as the employees who report to the supervisor in the example above. Finally, UPS cites an accounting textbook that defines indirect costs as those "incurred in providing benefits to several different cost objects." Petitioner's Br. 40 (emphasis omitted). UPS, however, never explains why single-product costs that support intermediate cost objects (such as subordinate employees) as well as final cost objects (*i.e.*, end product) fall outside this definition.

Put simply, UPS has failed to show that the Accountability Act unambiguously compels a reading of "indirect postal costs" that includes only those costs that are shared across products. Under *Chevron*, we therefore defer to the Commission's reasonable view that the term can include those single-product costs that vary indirectly with volume.

## C.

UPS argues that even if the Commission's interpretations of "institutional costs" or "indirect postal costs" are permissible, *Chevron* deference is inappropriate because the Commission made "no 'reasonable attempt to grapple' with or even refer back to the statutory text." Petitioner's Br. 45 (quoting *BP Energy Co. v. FERC*, 828 F.3d 959, 965 (D.C. Cir. 2016)). In our view, the Commission had no need to say anything more. "Institutional costs" and "indirect postal costs" have established meanings in the postal ratemaking context, *see supra* at 14–21, and the orders are faithful to these meanings, *see* Order at 10 (describing "institutional costs" as "residual costs"); *id.* at 103 (explaining that "the piggyback method" applies to "cost components that contain support activities"). To be sure, "no amount of historical consistency can transmute an unreasoned statutory interpretation into a reasoned one." *Southeast Alabama Medical Center v. Sebelius*, 572 F.3d 912, 920 (D.C. Cir. 2009). Here, however, the longstanding definitions upon which the Commission relied create no anomalies and flow sensibly from text, history, and statutory structure. *Cf. id.* at 919–20 (requiring agency to explain its historical view that a hospital's "wage-related costs" include postage costs where, even in litigation, the agency offered but "one somewhat opaque rationale" that was itself apparently inconsistent with the agency's treatment of certain other costs). The Commission therefore had no duty to expressly justify its decision to continue embracing them. *See Hall v. McLaughlin*, 864 F.2d 868, 872 (D.C. Cir. 1989) ("Where the reviewing court can ascertain that the agency has not in fact diverged from past decisions, the need for a comprehensive and explicit statement of its current rationale is less pressing.").

UPS believes that this rationale cannot save the orders' treatment of either "institutional costs" or "indirect postal

costs." With respect to "institutional costs," UPS argues that the interpretation reflected in the orders represents an unexplained deviation from the Commission's prior reading of the term. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (agency must provide "a reasoned explanation" for a change in policy position). By including some variable costs among institutional costs, UPS argues, the Commission has departed from its previous statements that "institutional costs do not vary with volume," 2012 Order at 23, and that "variability with volume should be sufficient to establish causality" and thus attribution, Appendices to Opinion and Recommended Decision, App'x B, No. R80-1, at 26 (Postal Rate Comm'n Feb. 19, 1981). Notwithstanding these sentences, cherry-picked and shorn of context, the Commission has never taken the view that all variable costs, including all inframarginal costs, bear an adequate causal relationship with specific products to be counted among costs attributable or—what amounts to the same thing—that no variable costs may be considered institutional costs. Indeed, it was the Commission's previous classification of *all* inframarginal costs—which UPS accepts are variable costs, *see* Petitioner's Br. 44—as institutional that prompted UPS to petition the Commission in the first place.

With respect to "indirect postal costs," UPS argues that the orders failed to make clear what meaning the Commission assigned to the term because, as the Commission acknowledges, they "'declined' to pass on whether 'indirect costs' include joint costs." Reply Br. 13 (quoting Respondent's Br. 53). But the Commission had no need to opine on whether "indirect postal costs" include joint costs *in addition* to single-product costs that vary indirectly with product volume: recognizing that the term includes *at least* the latter, as the Commission has consistently done, was sufficient to defeat UPS's argument that no indirect costs would be attributed

under the Commission's newly adopted cost-attribution scheme.

**III.**

This brings us to UPS's argument that the challenged orders are "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). In considering this argument, we emphasize our "'reluctan[ce] to interfere with [an] agency's reasoned judgments' about technical questions within its area of expertise." *Alliance of Nonprofit Mailers v. Postal Regulatory Comm'n*, 790 F.3d 186, 197 (D.C. Cir. 2015) (second alteration in original) (quoting *NRG Power Marketing, LLC v. FERC*, 718 F.3d 947, 953 (D.C. Cir. 2013)). As the Supreme Court has recognized, Congress vested postal ratemaking authority in the Commission out of a desire to harness "the educated and politically insulated discretion of experts." *NAGCP*, 462 U.S. at 823. Consequently, Congress has not "dictate[d] or exclude[d] the use of any method of attributing costs," *id.* at 820, leaving it to "the expert ratesetting agency, exercising its reasonable judgment . . . to decide which methods sufficiently identify the requisite causal connection between particular services and particular costs," *id.* at 827. In considering whether the orders suffer from arbitrary and capricious decision-making, then, we ask only whether "the Commission's exercise of its authority [was] 'reasonable and reasonably explained.'" *U.S. Postal Service*, 785 F.3d at 750 (quoting *Manufacturers Railway Co.*, 676 F.3d at 1096).

**A.**

UPS first argues that the Commission failed to "reasonably explain[]" the adoption of its incremental-cost methodology. *Id.* (quoting *Manufacturers Railway Co.*, 676 F.3d at 1096). Given that we have already considered and rejected UPS's claim that the Commission inadequately explained its statutory

interpretation, *see supra* at 22–24, UPS is left with its argument that the Commission failed to explain how its chosen approach "serve[d] the [Accountability Act's] objectives," *Northpoint Technology, Ltd. v. FCC*, 412 F.3d 145, 151 (D.C. Cir. 2005). We find the Commission's explanation perfectly adequate.

Though recognizing that the Accountability Act was "intended to ensure that the Postal Service competes fairly in the provision of competitive products," Order at 121 (quoting Senate Report at 19), the Commission rejected UPS's complaint that attributing only incremental costs fails to fulfill this goal, *see id.* at 57. In the Commission's view, "[t]he purpose of the incremental cost test is not to ensure that the Postal Service is competing fairly," but rather, as used here, to "ensure that products cover all of the costs the Postal Service incurs in providing them," which in turn plays but a contributing role in the statute's overall pro-competitive aims. *Id.* at 58.

The Commission properly recognized that its role is to carry out the particulars of the scheme Congress created, not to engineer specific market outcomes. The Supreme Court, while acknowledging that "Congress' concern about . . . cross-subsidies, of course, was one motive for including [a] rate floor" in a predecessor statute, observed that Congress also took care to provide that cost attribution be methodologically sound. *NAGCP*, 462 U.S. at 829 n.24. Indeed, before the Commission, UPS itself recognized that "[t]he relevant inquiry" in selecting a cost attribution approach "is whether the Postal Service's . . . practices comply with [the Accountability Act]," Reply Comments of United Parcel Service, Inc. Regarding UPS Proposals One and Two, No. RM2016-2, at 33 (Postal Regulatory Comm'n Mar. 25, 2016), not the approach's effects on "market conditions," *id.* at 36. This is correct. "Congress," as UPS explained, "did not direct the Commission

to consider prevailing market conditions in connection with" cost attribution. *Id.* at 37. In any event, despite its fear that leaving some inframarginal costs unattributed "might allow the Postal Service to monopolize otherwise competitive markets," Petitioner's Br. 49, UPS offers no reason to doubt that the Accountability Act's prohibition on cross-subsidization, 39 U.S.C. § 3633(a)(1), and requirement that competitive products cover a share of institutional costs, *id.* § 3633(a)(3), will adequately ameliorate any competitive deficit left by the Commission's approach to cost attribution, *cf. id.* § 3633(b) (requiring Commission to consider "the prevailing competitive conditions in the market" when setting competitive products' share of institutional costs); Competitive Postal Products, 83 Fed. Reg. 6758, 6774 (Postal Regulatory Comm'n Feb. 14, 2018) (proposing a new, formula-based method for determining competitive products' share of institutional costs that will be "more responsive to changing market conditions").

**B.**

Next, UPS argues that the Commission's adoption of an incremental-cost approach to attribution was itself arbitrary and capricious, insisting that this approach suffers from the very same features that led the Commission to reject UPS's proposal that all inframarginal costs be attributed. *See U.S. Postal Service*, 785 F.3d at 753 ("The agency fails to reasonably explain its decision if it gives 'differential treatment of seemingly like cases.'" (quoting *LePage's 2000, Inc. v. Postal Regulatory Comm'n*, 642 F.3d 225, 232 (D.C. Cir. 2011))). In support, it offers three arguments, none persuasive.

It begins by challenging the Commission's rejection of the assumption that any given product is just as likely to be responsible for "early," more expensive cost-driver units as it is for "later," less expensive units. This assumption, which the Commission deemed "empirically unverifiable," Order at 46,

underlay UPS's proposal to distribute inframarginal costs among products according to each product's contribution to cost-driver quantity. The Commission's rejection of this assumption was arbitrary, UPS argues, because the Commission's own incremental-cost approach was "based on [the] even more unverifiable assumption" that all products use only the latest, lowest-priced cost-driver units and so bear the minimum possible inframarginal costs. Petitioner's Br. 53.

UPS misunderstands the Commission's statutory task, namely to attribute only those costs that can be linked to a product "through reliably identified causal relationships." 39 U.S.C. § 3631(b). Contrary to UPS's claim that the Commission untenably assumed that "*every* product comes *last*" in the production chain, Petitioner's Br. 53, the Commission simply declined to assume that any given product incurred more than the minimum cost that could reliably be assigned to it. Attributing *more* than this amount, after all, necessitates guesswork, and the Commission sensibly concluded that such guesswork was inconsistent with its statutory obligation to base attribution on only "reliably identified causal relationships." 39 U.S.C. § 3631(b).

UPS's second argument—that the Commission acted arbitrarily in rejecting distribution keys as a means of apportioning inframarginal costs—fails for the same reason. As the Commission saw it, attributing inframarginal costs on the basis of distribution keys, which measure only the share of cost-driver units for which a given product is responsible, would rely on the "unverifiable assumption that the proportion of inframarginal costs incurred by [a] product is identical to the proportion" of cost-driver units generated by that product. Order at 51. Here, too, the Commission reasonably declined to make this assumption absent supporting evidence. Nor, contrary to UPS's argument, did the Commission act

inconsistently by using distribution keys as part of its incremental-cost approach. After all, the Commission uses them only for their intended purpose—to determine how many of any given activity's cost-driver units derive from any one product. From there, the Commission calculates "the marginal cost of providing [each of these] specific unit[s]" without further recourse to the distribution keys. *Id.* at 50.

The third and final argument takes aim at the Commission's rejection of UPS's proposed method for estimating an activity's total inframarginal costs in the first place, prior to any question of attribution. To arrive at an estimate of an activity's total costs, the Postal Service would have to estimate the cost of each cost-driver unit, even the earliest, most costly units associated with low levels of volume. As the Commission explained, though, "[a] real-world multi-product firm does not have the information necessary" to estimate costs at such volume levels because "it has not experienced" them. *Id.* at 8. UPS proposed to get around this problem by employing an assumption of constant elasticity— *i.e.*, an assumption that each added unit of product quantity corresponds to an equal decrease in marginal cost—that would allow the Postal Service to extrapolate backwards from present, observed volumes. *Id.* at 38; *see also* Order App'x A at 4–5 (explaining constant elasticity). The Commission rejected this approach as untenable because "[a]pplying the constant elasticity assumption to levels of volume far beyond the range of actual experience produces results that are inadequately supported and unreliable." Order at 39.

Here, too, UPS responds that the Commission itself relies on a constant-elasticity assumption when extrapolating backward from present values to estimate a product's incremental cost. The Commission, however, explained that the incremental-cost test "avoids the issues facing UPS's

proposed method by restricting itself to limited amounts of volume" and by "estimat[ing] inframarginal costs in a very small range of [an activity's] cost curve where the constant elasticity assumption has been empirically verified." *Id.* at 42. UPS challenges the Commission's claim that it applies the assumption over only a small range of volumes. As the Commission points out, however, competitive products make up a small fraction of the Service's total business, *see Financial Analysis* at 92, making it reasonable to believe that any one competitive product represents a comparatively small range of any given activity's marginal cost curve. UPS further argues that, even within that range, the Commission's empirical justification for the constant-elasticity assumption rests on a 20-year-old article that predated "significant changes in the Postal Service's competitive parcel business in the 21st century." Petitioner's Br. 61. But UPS has identified no substantive deficiency in the article or any way intervening events have undermined its conclusions. At any rate, it was hardly arbitrary for the Commission to find the constant-elasticity assumption sufficiently reliable to make a limited extrapolation from present conditions but insufficiently reliable to estimate cost at all levels of production volume.

Alternatively, UPS suggests that the Commission could calculate inframarginal costs by simply subtracting one known quantity—an activity's volume-variable costs—from another—that activity's total costs. The Commission, however, reasonably concluded that this method of calculation would "result[] in an overstatement of the inframarginal costs of that" activity because it disregards the fact that fixed costs—neither volume-variable nor inframarginal—comprise part of an activity's total costs. Order at 39. UPS responds that "the Postal Service can subtract those fixed costs from the [activity's] total costs." Petitioner's Br. 62. But the Postal Service informed the Commission that it does not currently "determine which of its

costs are fixed," and that doing so would require it to "answer[] difficult counterfactual questions" about "which costs would remain if the Postal Service handled no volume." Postal Service Responses at 11 & n.9. UPS has proposed no reliable means of calculating fixed costs, merely claiming without support that additional data from the Postal Service would, if made available, suggest a way forward.

## IV.

The Accountability Act requires a competitive product to cover only those costs that can be attributed to the product "through reliably identified causal relationships." 39 U.S.C. § 3631(b). In establishing this causal requirement, Congress expected that "the expert ratesetting agency, exercising its reasonable judgment" would "decide which methods sufficiently identify the requisite causal connection between particular services and particular costs." *NAGCP*, 462 U.S. at 827. Here, the Commission did exactly that, settling on a cost-attribution methodology that implements its statutory mandate and falls well within the scope of its considerable discretion. Because "the Commission's exercise of its authority [was] 'reasonable and reasonably explained,'" *U.S. Postal Service*, 785 F.3d at 750 (quoting *Manufacturers Railway Co.*, 676 F.3d at 1096), we deny UPS's petitions for review.

*So ordered.*